UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. S2-4:10 CR 119 CEJ (TIA) |
| | ) |
| LELAND BEASLEY, | ) |
| | ) |
| Defendant. | ) |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE AND STATEMENTS**

COMES NOW, the United States of America, by and through Richard G. Callahan, United States Attorney for the Eastern District of Missouri, and Robert F. Livergood, Assistant United States Attorney for said District, and for its Response in Opposition to Defendant's Motions to Suppress Evidence and Statements, states as follows:

**I. INTRODUCTION**

The defendant has been indicted by a second superseding indictment on nine counts of production of child pornography and two counts of possession of child pornography. The defendant claims in his suppression motions (1) that all statements made by the defendant should be suppressed because the waiver of his Miranda rights was coerced; (2) that evidence seized by law enforcement officers from the house of defendant's mother should be suppressed because defendant's mother did not have authority to consent to the search and seizure of defendant's property, and the police were aware that the mother lacked the authority to grant consent; and (3) that the evidence seized from defendant should be suppressed even though defendant signed a consent to search form because defendant had requested and was denied counsel prior to

1

signing the consent and defendant had not read his <u>Miranda</u> rights form prior to signing the consent form.

The evidence adduced at the evidentiary hearing will show that the defendant was properly advised of his <u>Miranda</u> warnings and defendant's property was searched and seized as a result of valid consents to search.

## II.  FACTS

The government anticipates the evidence at the evidentiary hearing will establish the following:

Defendant was the owner and operator of several different Gamestation Sector 19 (hereinafter, "Gamestation") stores.  He owned Gamestation stores located at: (1) 137 Lemay Ferry Road, St. Louis, Missouri, from March 2006 to November 2006; (2) 2921 Lemay Ferry Road, St. Louis, Missouri, from November 2006 to January 2007; (3) 3861 Lemay Ferry Road, St. Louis, Missouri, from January 2007 to April 2008; and (4) 710 Lemay Ferry Road, St. Louis, Missouri, from April 2008 to January 2009.  Defendant operated video games at the stores.  The customers were mostly children.  Defendant hosted "lock-ins" where children paid a fee to play video games and sleep overnight at the store.  During the "lock-ins" the children were in the custody, care, or supervisory control of the defendant.

On January 5, 2009, Sergeant Gary Guinn of the St. Louis County Police Department was contacted by a worker for the Missouri Children's Division about a claim that defendant inappropriately touched a child, K.N.  Sgt. Guinn assigned the investigation to Detective Cavaletti of the St. Louis County Police Department.  Det. Cavaletti met with K.N.  K.N. said that in December 2008, while he was at the Gamestation located at 710 Lemay Ferry Road,

defendant touched K.N.'s penis through the clothing.  K.N. said that defendant tried to put his hand into K.N.'s pants.  K.N. identified other children whom he believed were molested by defendant.  Det. Cavaletti, and others, met with several other children who said they were molested by the defendant while at the Gamestation stores,  all of which were located in the Eastern District of Missouri.  One of the children told the officers that while at the Gamestation store located at 137 Lemay Ferry Road he and another child used a computer in the store.  While using the computer he observed photographs of nude, young, teen boys between the ages of 13 and 14 years old boys touching their genitals.

     At approximately 4:10 p.m. on January 5, 2009, Det. Cavaletti and Sergeant Guinn went to the Gamestation located at 710 Lemay Ferry Road.  Inside the store were children playing video games.  There, they met with defendant.  Defendant acknowledged to the officers that the store was his.  The officers asked the defendant if he had any personal computers.  He pointed to a HP laptop computer.  The officers asked him for consent to search the computer.  Defendant freely and voluntarily signed a consent form allowing the officers to seize and search the computer.  The defendant was asked and agreed to go with the officers to Police Headquarters in Clayton, Missouri.

     At approximately 4:30 p.m. Det. Caveletti transported the defendant to Police Headquarters.  They arrived there at approximately 5:00 p.m.  Defendant was escorted to an interview room.  At approximately  5:05 p.m., Detectives Cavaletti and Matthew Brillos asked defendant to sign a second consent form allowing them to examine the contents of the HP laptop computer.  The defendant freely and voluntarily signed the form.  The HP laptop computer was examined and nothing of evidentiary value was found on the computer.

At approximately 5:30 p.m., Det. Cavaletti and Sgt. Guinn entered the interview room and read defendant his Miranda rights.  Defendant initialed next to each right and signed the warning and waiver form, acknowledging that he understood his rights and was willing to answer questions.  Defendant also orally acknowledged that he understood his rights and was willing to speak with the detectives.

The defendant was then interviewed by the officers.  During the interview, defendant said, among other things, that he had previously been arrested in Jefferson County on charges that he performed oral sex on his girlfriend's son.  He stated he was never charged for the crime.  He also said he was arrested in St. Louis City on similar charges.  He said he went to trial and was acquitted.

The interview concluded at approximately 7:45 p.m.  Defendant was charged with Child Molestation in the First Degree and Statutory Sodomy in the First Degree.  He was transported to the St. Louis County Justice Center and held pending application of warrant.

At the request of the defendant, his HP computer was returned to Mr. Tim Douglas, an employee, at approximately 9:00 p.m.

Det. Cavaletti continued his investigation.  On January 6, 2009, he and Det. Barbara Lane, of the St. Louis County Police Department, met with one of defendant's employees, Tim Douglas.  Mr. Douglas told the detectives that the defendant called him on January 5, 2009, after the defendant's arrest.  During the telephone call, the defendant told Mr. Douglas to take a digital camera, video camera and some bags of clothes to 4218 Ridgewood St., St. Louis, Missouri, the residence of defendant's mother, Leslie Moss.  Mr. Douglas took the items from the Gamestation to Ms. Moss' residence.

Det. Cavaletti continued to talk with additional children regarding defendant's behavior during "lock-ins" at the Gamestations and investigated additional "hotline calls" made to the State of Missouri Children's Division concerning allegations of sexual abuse perpetrated by defendant.

Unbeknownst to law enforcement officers, on January 7, 2009, defendant called his mother, Ms. Moss, from the St. Louis County Jail. The telephone calls from St. Louis County are recorded and the defendant was aware that the telephone calls were recorded. The telephone call recordings were not obtained by law enforcement officers and they did not know about the content of the phone calls at the time.[1] During the course of the telephone conversation, defendant asked his mother to destroy some evidence. In particular, he asked his mother to destroy computer disks that Mr. Douglas had taken to her residence. On January 8, 2009, defendant again called his mother. Using coded language, he again asked his mother to destroy evidence, which included a metal lock box that contained cameras and recorded material, as well as recorded evidence on cameras and video cameras.

On January 9, 2009, defendant's ex-wife, Mary Day, contacted a St. Louis County police officer to say that she may have pertinent information concerning defendant. Sgt. Guinn contacted Ms. Day and made an appointment to meet with her. On January 13, 2009, Sgt. Guinn met with Ms. Day. Ms. Day said married defendant in June of 2005. She filed for a divorce after three months of marriage. Ms. Day said she was to get their vehicle as part of the divorce. She went to defendant's Gamestation store located in Missouri and retrieved the vehicle. After

---

[1] However, an assistant prosecuting attorney for the State of Missouri did obtain some of the jail phone calls around February 13, 2009. The officers were made aware of some of the content of the recorded phone calls after that date.

she retrieved the vehicle she went through it to return items that belonged to defendant. She found several CDs. She viewed some of the CDs on her computer and found child pornography. She turned the CDs over to the St. Clair County Sheriff's Department in Illinois. The CDs were seized on August 28, 2007, by the St. Clair County Sheriff's Department. The disks were turned over to Det. Cavaletti on January 15, 2009.

On January 16, 2009, Sgt. Guinn interviewed defendant's mother, Leslie Moss, at her place of employment. She said she was aware of defendant's arrest. She said that the defendant never lived at her current residence located at 4218 Ridgewood. She said that he used her address for his driver's license and other things, but he did not reside with her. She said he had some personal belongings stored at her house but he rarely came by the residence.

Ms. Moss said she received a phone call from defendant the night he was arrested. She said that a young man, Mr. Douglas, who worked with the defendant brought some of defendant's personal items from the Gamestation store to her residence. She said that the young man brought, among other things, two cameras to her house. She gave Sgt. Guinn permission to seize various items and signed a consent form. Sgt. Guinn and Ms. Moss went to her residence. There, Sgt. Guinn seized, among other things:

1. Canon canvas bag containing papers and a DVD recorder, among other things,
2. Sony digital camera
3. Sony Digital camcorder
4. Metal lock box.

Later on that same day, unbeknownst to law enforcement officers, defendant called his mother. Ms. Moss informed the defendant that she did not destroy the evidence that Mr.

Douglas had brought to her house and that the detectives seized some of it.

Later that same day, Det. Cavaletti reviewed the disks obtained from St. Clair County Sheriff's Office. The disks contained hundreds of images of male children engaged in sexually explicit conduct. Some of the images were taken with a camera with the same model number as that of defendant's camera. Some of the images appeared to have been taken at defendant's Gamestation store located at 710 Lemay Ferry Road.

On January 19, 2009 at about 12:30 p.m., Det. Cavaletti and Det. Brillos went to St. Louis County Justice Center where defendant was being held. They obtained permission to transport defendant from the Justice Center to Police Headquarters. At approximately 12:40 p.m., Detectives Cavaletti and Brillos placed the defendant in an interview room at police headquarters. Det. Cavaletti said they wanted to talk to the defendant about a new criminal incident. The detectives told defendant that they had recovered the cameras and metal strongbox that Mr. Douglas had taken to Ms. Moss's residence. Det. Cavaletti said that he wanted to get consent from the defendant to search the seized cameras and lock box. Defendant was escorted to another interview room near by that contained the metal strong box, 11 compact disks, Sony Digital camera, Sony Video Camera and printed facial photographs of victims. The metal strong box, Sony camera, Sony Handycam video camera had not be searched by law enforcement officers. Det. Brillos asked the defendant if he would consent to search the cameras and the metal lock box. Defendant orally agreed to give the detectives consent.

The defendant was escorted back to the original interview room. Det. Brillos read the consent to search digital data devices form to the defendant. The defendant signed the form at approximately 12:50 p.m. Det. Brillos then read to the defendant the Consent to Search Form to

search the metal lock box.  Defendant then said that he did not know if that was his box.  Det. Cavaletti asked the defendant if his box looked like the box he just saw.  Defendant said it did.  Det. Cavaletti asked if his metal lock box had a combination lock.  Defendant said it did.  Det. Cavaletti told the defendant that this was the metal lock box that Mr. Douglas had taken to Ms. Moss residence from the Gamestation store.  Det. Cavaletti asked the defendant for the combination to the metal lock box so that it would not be forced open.  Defendant said that he forgot the combination.  Defendant then signed the consent to search form at approximately 12:50 p.m.

Det. Cavaletti then said he would like to speak with the defendant about a new crimnal offense.  Det. Cavaletti read defendant his Miranda rights.  Defendant refused to sign the form and said he would not speak with the detectives without his attorney being present.

At approximately 1:30 p.m., Detectives Cavaletti and Brillos transported defendant back to the Justice Center.

### III.  LEGAL ANALYSIS

A. Events at the Gamestation Store on January 5, 2009

On January 5, 2009, Sgt. Guinn and Det. Cavaletti met with the defendant at his Gamestation store, which was open to the public.  When the officers arrived at the store during normal business hours, there were children playing video games inside the store.  They asked to speak with the defendant and he agreed to do so.  He was not handcuffed nor in any way detained.  The defendant and the officers talked and the defendant gave consent to officers permitting them to search and seize his HP computer.

A consensual encounter does not implicate the Fourth Amendment. United States v. Hathcock, 103 F.3d 715, 718 (8th Cir.1997). "Law enforcement officers do not violate

> the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." United States v. Vera, 457 F.3d 831, 834 (8th Cir.2006), quoting United States v. Drayton, 536 U.S. 194, 200, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). "Mere police questioning does not constitute a seizure." United States v. Barry, 394 F.3d 1070, 1074 (8th Cir. 2005), quoting Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); Hathcock, 103 F.3d at 719; United States v. Slater, 411 F.3d 1003, 1005 (8th Cir. 2005). A consensual encounter becomes a seizure implicating the Fourth Amendment when, considering the totality of the circumstances, the questioning is "so intimidating, threatening, or coercive that a reasonable person would not have believed himself free to leave." Hathcock, 103 F.3d at 718, quoting United States v. McKines, 933 F.2d 1412, 1419 (8th Cir. 1991) (en banc); see also United States v. Johnson, 326 F.3d 1018, 1021 (8th Cir. 2003); INS v. Delgado, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

United States v. Flores-Sandoval, 474 F.3d 1142, 1145 (8th Cir. 2007). The officers met the defendant in his store and he was free to leave. "The protections of Miranda apply to custodial interrogations." Id. at 1146. Here, the defendant was not in custody and was not required to be informed of his Miranda. Therefore, any statements made by the defendant at the Gamestation store on January 5, 2009, should not be suppressed.

The consent to search and seize defendant's HP computer was also valid. Without any threat or coercion, the defendant voluntarily agreed to the search of his HP computer.

> "The Fourth Amendment protects individuals against unreasonable searches and seizures by the government." United States v. Luken, 560 F.3d 741, 744 (8th Cir.2009) (quoting United States v. Williams, 521 F.3d 902, 905 (8th Cir.2008)). The Fourth Amendment generally requires the government to obtain a warrant before searching an area where an individual has a reasonable expectation of privacy. See United States v. Parker, 587 F.3d 871, 878 (8th Cir.2009). A search conducted pursuant to voluntary consent is recognized as an exception to the Fourth Amendment's search warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

United States v. Shafer, 608 F.3d 1056, 1064 (8th Cir. 2010). Thus, the seizure and search of the computer should not be suppressed.

    B.  Events at Police Headquarters on January 5, 2009

9

At the Gamestation store, the police asked the defendant to accompany them to Police Headquarters in Clayton, Missouri.  Defendant was not in custody, and freely and voluntarily accompanied the officers to the Police Headquarters.  When they arrived at Police Headquarters, defendant was asked to sign another consent form.  This form was entitled, "Consent to Search (Digital Data Devices)."   This form also gave the officers consent to search the HP computer.  Thus, defendant again voluntarily consented to the search of the HP computer and this the search and seizure of the computer should not be suppressed.  See id.

After defendant consented to the search, he was interviewed at Police Headquarters.  Defendant was read his Miranda rights and waived those rights in writing and orally.  No threats or promises made to him in order to induce him to waive his rights.  During the course of the interview, defendant never invoked his rights.   Thus, defendant waived his rights and his statements are therefore admissible.

    C.   Events at Ms. Moss residence on January 16, 2009

On January 16, 2009, Sgt. Guinn met with Ms. Moss and she consented to the police seizing the items brought to her residence by Mr. Douglas.  Defendant claims that this seizure was unconstitutional.  Here, Ms. Moss had apparent or actual authority to consent to the officers seizing the items.  When the officer met with Ms. Moss, he knew that Mr. Douglas had transported defendant's property to her house from the Gamestation store.  However, the officer was not aware of defendant's instructions to his mother to destroy the evidence.  Defendant cites to United States v. Mar James, 353 F.3d 606 (8th Cir. 2003), to support his claim that the evidence should be suppressed.  In Mar James, a bailee gave the officers permission to search and seize James' property when the officers knew that the bailee did not have authority to grant

10

that permission.  Id.  In the case at hand, the officers seized defendant's property from his mother's house with her consent and she had apparent authority to do so.  Furthermore, they did not search the property until defendant granted the officers permission to search it.

In United States v. Jarrett James, 571 F.3d 707 (7th Cir. 2009), defendant stored a gun used in a robbery in a safe located in his mother's residence.  Jarrett James' mother gave officers permission to seize the safe.  Once the safe was seized, officers obtained a search warrant to open the safe.  The court found defendant's mother had authority to consent to the seizure of the safe.  It said that "[c]onsent to search or seizure may be obtained from any person who has common authority over the property (actual authority), or who would appear to a reasonable person, given the information that law enforcement possessed, to have common authority over the property (apparent authority).  Id. at 714.  As to the initial seizure of the safe, the court said that defendant's mother had authority to consent if: "(1) she had joint control or access to the safe itself (regardless of whether she had access to the contents of the safe) (actual authority); or (2) it was reasonable for police to believe she had joint control of or access to the safe itself (apparent authority)."  Id.  The court found that even though the safe only contained the defendant's belongings, his mother "exercised control over the safe itself.  There [was] no evidence that [defendant] attempted to limit or restrict her control over the safe. . . . Even if [defendant] had not granted actual authority to [his mother], she had apparent authority because a reasonable person, given the information that [police officers] possessed, would believe that [she] had joint control of the safe."  Id.

In the instant offense, the officers were not aware of defendant's phone calls to his mother asking her to destroy the evidence.  Defendant's mother had apparent authority to

consent to the seizure of the property. When Sgt. Guinn asked permission to seize defendant's property from her, she voluntarily gave that permission. She signed a consent form which read, in part, "I give my consent voluntarily. I have not been threatened, nor have any promises been made to me to obtain my consent." Thus, the property was properly seized by law enforcement officers.

Furthermore, the evidence could have easily been destroyed because it contained recordings. The officers would have been able to seize it to prevent its destruction under exigent circumstances, even though they were unaware of defendant's request to his mother.

D. Events at Police Headquarters on January 19, 2009

Defendant's next encounter with the police was on January 19, 2009. At police headquarters he was presented with evidence that was seized at his mother's residence on January 16, 2009, as well as other items. He consented to the search of the items seized from his mother's house. He signed two different consent to search forms. One was a "Consent to Search (Digital Data Devices)" for the Sony digital camera and Sony Handycam video camera. He also signed a "Consent to Search" form permitting the officers to search the contents of the black combination box. In both forms defendant agreed that he gave his consent voluntarily and indicated that no threats or promises had been made to him to obtain his consent. Det. Brillos read the language of one of the forms to him out loud.

Defendant was in custody at the time he gave the officers consent to search. The court in United States v. Arciniega, 569 F.3d 394, 398 (8th Cir. 2009), set forth factors to be considered as to whether the consent was voluntary:

> Factors relevant to the analysis include (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the

12

> individual was informed of his Miranda rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

Id. (citations omitted); see also United States v. Golinveaux, 2010 WL 2925711(8th Cir.).

Here, the defendant was an adult who did not appear to have deficient mental abilities. He did not appear to be under the influence of drugs or alcohol.  He had previously been informed of his Miranda rights, and, in fact, he was very familiar with the criminal justice system because had two prior arrests and went to trial on a previous charge.  Although defendant had been confined approximately two weeks, the police did not threaten, intimidate, promise or punish the defendant to extract his consent.  Finally, defendant consented in writing on two separate consent forms.  Thus, defendant's consent was voluntary.

During the course of the consent, the officers talked with the defendant.  When presented with the locked box, defendant said he did not know whether the box was really his.  At this point there was a discussion about the box.  This was not a custodial interrogation for which Miranda warnings were required.

> Interrogation occurs when a law enforcement officer engages in "either express questioning or its functional equivalent," which includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  "Voluntary statements not in response to an interrogation," however, "are admissible with or without Miranda warnings."

United States v. Hernandez-Mendoza, 600 F.3d 971, 976-77 (8th Cir. 2010) (citations omitted).

Thus, defendant's asking the officers whether the metal lock box was really his and discussion

13

that followed was not an interrogation and should not be suppressed.

## IV.  CONCLUSION

For all of the foregoing reasons, the defendant's motion to suppress evidence and statements should be denied.

>Respectfully submitted,
>
>RICHARD G. CALLAHAN
>United States Attorney
>
>
> *s/ Robert F. Livergood*
>ROBERT F. LIVERGOOD, 22937
>Assistant United States Attorney
>111 S. 10th Street, Rm. 20.333
>St. Louis, Missouri 63102
>(314) 539-2200

**CERTIFICATE OF SERVICE**

I hereby certify that on August 6, 2010, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Ms. Nanci McCarthy
Assistant Federal Public Defender
Office of the Federal Public Defender
1010 Market Street, Suite 200
St. Louis, MO 63101

*s/ Robert F. Livergood*
ROBERT F. LIVERGOOD, 22937
Assistant United States Attorney