UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S2-4:10 CR 119 CEJ (TIA) |
| | ) | |
| LELAND BEASLEY, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S AMENDED POST EVIDENTIARY HEARING BRIEF IN OPPOSITION TO DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE AND STATEMENTS**

COMES NOW, the United States of America, by and through Richard G. Callahan, United States Attorney for the Eastern District of Missouri, and Robert F. Livergood, Assistant United States Attorney for said District, and for its Amended Post Evidentiary Hearing Brief in Opposition to Defendant's Motions to Suppress Evidence and Statements, states as follows:

**I.  INTRODUCTION**

The defendant has been indicted by a second superseding indictment on nine counts of production of child pornography and two counts of possession of child pornography.  The defendant claims in his suppression motions (1) that all statements made by the defendant should be suppressed because the waiver of his Miranda rights was coerced; (2) that evidence seized by law enforcement officers from the house of defendant's mother should be suppressed because defendant's mother did not have authority to consent to the search and seizure of defendant's property, and the police were aware that the mother lacked the authority to grant consent; and (3) that the evidence seized from defendant should be suppressed even though defendant signed

1

a consent to search form because defendant had requested and was denied counsel prior to signing the consent and defendant had not read his Miranda rights form prior to signing the consent form.

An evidentiary hearing was conducted on August 30, 2010.  The evidence adduced at the evidentiary hearing showed that the statements made by defendant and the property searched and seized should not be suppressed.

## II.  FACTS

The following was established at the evidentiary hearing:

Defendant was the owner and operator of several different Gamestation Sector 19 stores located in the Lemay area of South County.  "Transcript of Hearing Before Magistrate Terry I. Adelman" (Tr.) at 6-7.  He only had one store open at a time.  Id. at 7.  Children paid a fee to play video games and sleep overnight at the store during the "lock-ins," which were supervised by defendant.  Id. at 10.  The store he operated at the time of the police investigation in this matter was located at 710 Lemay Ferry Road.  Id.

On January 5, 2009, Sergeant Gary Guinn of the St. Louis County Police Department received notification from the Missouri Children's Division about a claim that defendant inappropriately touched a child, K.N.  Id. at 4-5.  Sgt. Guinn assigned the investigation to Detective Cavaletti of the St. Louis County Police Department.  Id. 5.  Det. Cavaletti met with K.N.  Id.  K.N. said defendant touched K.N.'s penis through the clothing and defendant tried to put his hand into K.N.'s pants.  Id. at 5-6.  Det. Cavaletti met with other children during his investigation.  Id. at 6.  Some of the children said that they observed child pornography on a computer that was either owned by or in the possession of defendant.  Id.

2

Around 4:00 p.m. on January 5, 2009, Det. Cavaletti and Sergeant Guinn drove in unmarked cars to the Gamestation Sector 19 store located at 710 Lemay Ferry Road.  Id. at 7-8.  Children were playing video games inside the store.  Id. at 8.  When the officers entered the store they were not wearing uniforms, did not have their guns drawn, and did not display any force.  Id.  They identified themselves as police and showed the defendant their badges.  Id. at 26.  Defendant was nervous as most people are when police officers arrive.  Id. at 27.  The police and the defendant talked.  During their conversation the officers asked the defendant if he had any personal computers.  Id. at 9.  He said he had a personal laptop computer in the store.  Id.  Defendant orally and in writing consented to the officers searching the computer.  Id.  9-10; see also, Government Exhibit ("Gov. Ex.") 1.  Defendant did not appear to be under the influence of anything that would impair his mental abilities.  Tr. at 11.  He also appeared to understand what he was doing.  Id.  No threats or promises were made to the defendant.  Id. at 12.  Defendant freely and voluntarily signed a consent form allowing the officers to seize and search the computer.  Id. at 11.   In pertinent part, the consent form stated:

> I, Leland Beasley, hereby consent and agree that police officer(s) of this department may search: computers at 701 Lemay Ferry/HP Computer (black) and that they may retain any article fond that may be used as evidence.  I give my consent voluntarily.  I have not been threatened, nor have any promises been made to me to obtain my consent.

Gov. Ex. 1.

The offices next asked defendant if he would accompany them to Police Headquarters in Clayton, Missouri.  Tr. at 13. Defendant was not under arrest nor placed in handcuffs.  Id.  Defendant went with the police voluntarily.  Id. at 27.

They arrived there at Police Headquarters at approximately 5:00 p.m.  Id. at 14.  At approximately  5:05 p.m., Detectives Cavaletti and Matthew Brillos asked defendant to sign a

second consent form granting the police permission to search the contents of the HP laptop computer.  Id. at 41-42; Gov. Ex. 4.  The consent form was read to defendant by Det. Cavaletti.  Tr. at 42.  Defendant appeared to be listening as the form was read to him.  Id. at 43.  The defendant freely and voluntarily signed the form.  Id. at 43-44; Gov. Ex. 4.  No threats or promises were made to defendant nor were any weapons drawn nor were voices raised.  Tr. at 44.  There was no show of force.  Id.  Defendant was not handcuffed.  Id. at 53.  Defendant did not appear to be under the influence of drugs or alcohol.  Id. at 44.  The defendant appeared to understand what he was doing.  Id.

At approximately 5:30 p.m., Det. Cavaletti and Sgt. Guinn entered the interview room.  Id. at 14-16.  Defendant was not under arrest.  Id. at 15.  He was not handcuffed and the officers were not wearing weapons.  Id.  The defendant had not requested an attorney nor had he indicated that he wished to remain silent.  Id. at 15-16.  Det. Cavaletti read defendant his Miranda rights.  Id.  at 16.  Defendant looked at the form as Det. Cavaletti read it to him and defendant indicated that he understood his rights.  Id. at 16-17.   Defendant initialed next to each right indicating that he understood them.  Id. at 17.  Defendant agreed with the following:

Before we ask you any questions, you must understand what your rights are:

1.  You do not have to make any statement at this time and have a right to remain silent.
2.  Anything you say can and will be used against you in a court of law.
3.  You are entitled to consult with an attorney before an interview and have an attorney present at the time of the interview.
4.  If you cannot afford an attorney, one will be appointed for you.

I have read the above statement of my rights and understood what my rights are.  I am willing to make a statement and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

4

Gov. Ex. 2; Id. at 18.  Defendant signed the Warning and Waiver form around 5:30 p.m. on

January 5, 2009.  Tr. 18, Gov. Ex. 2.  Defendant also orally acknowledged that he understood his

rights and was willing to speak with the detectives.  Tr. at 19.

During the course of the interview, defendant never indicated that he wished to remain

silent nor did he ask for an attorney.  Id.  The police did not threaten nor promise anything to the

defendant in order to induce him waive his rights or to continue to waive his rights.  Id.  There

was no type of intimidation whatsoever.  Id. at 19-20.  Defendant was not in custody.  Id. at 29.

During the interview defendant said, among other things, that he had previously been arrested in

Jefferson County for allegedly having oral sex wit his girlfriend's son.  Id. at 20.  He said he was

never charged with that crime, however.  Id.  He also said that he had been arrested in St. Louis

City for similar charges.  He indicated that he was charged with a crime and went through the

entire legal system and was acquitted.  Id.  Defendant's interview concluded around 7:45 p.m.

Id.  After the interview ended, defendant was arrested.  Id. at 21.

The investigation continued.  Id.  Sgt. Guinn learned that Tim Douglas took some items

from defendant's Gamestation Sector 19 store to the residence of defendant's mother, Leslie

Moss.  Id.  The items were taken by defendant's employee to Ms. Moss' house after defendant

was in jail.  Id. at 54.  On January 16, 2009, Sgt. Guinn met with Ms. Moss.  Id. at 21-22.  He

identified himself as a police officer.  Id. at 32-33.  During their meeting Sgt. Guinn asked her

for consent to seize the items taken from the Gamestation Sector 19 store to her house.  Id. at 22,

34.  She said the items belonged to defendant and were brought over to her house.  Id. at 22.  She

said that defendant did not reside with her at her house but he used the address for his driver's

license and other legal purposes.  Id.  Sgt. Guinn believed that Ms. Moss had the ability to grant

5

consent so that he could seize the items.  Id.  She signed the consent form.  Id. at 22; Gov. Ex. 3.
If Ms. Moss would not have given consent, Sgt. Guinn planned to apply for a search warrant to
seize the items.  Tr. at 23.  The contents of the items seized by Sgt. Guinn (Sony digital camera,
Sony digital video recorder, a large metal box that had a combination-type lock, a Canon bag)
were not searched, other than a bag of clothing, until defendant also consented to searching the
items.  Id. at 24, 34-35, 47, 49.  The bag of clothing was left at Ms. Moss' house.  Id. at 35.

On January 19, 2009, around 12:30 p.m., Det. Cavaletti and Det. Brillos went to St. Louis
County Justice Center where defendant was being held and transported defendant from the
Justice Center to Police Headquarters.  Id. at 45, 53.  Officers were conducting an investigation
concerning a new crime.  See id. at 48.  They showed the defendant the evidence seized from
Ms. Moss' residence so that he would know what the officers wanted to search.  Id. at 47.  When
the defendant saw the evidence he questioned whether the black combination box was his.  Id.
Det. Cavaletti then had a conversation with defendant about the box.  Id.  The officers also asked
defendant if the items belonged to him.  Id. at 59.

The police did not threaten nor promise anything to the defendant in order to induce him
to sign the consent forms.  Id. at 47.  Two consent to search forms were provided to the
defendant: "Consent to Search (Digital Data Devices)"  (Gov. Ex. 5) and  "Consent to Search"
(Gov. Ex. 6).  Defendant was read the "Consent to Search (Digital Data Devices)" form as well
as being given a copy of the form.  Tr. at 46.  He appeared to understand what was being read to
him.  Id. at 48.  Defendant never indicated that he did not want to sign the form.  Id.  He did not
ask for counsel.  Id. at 46.   No threats or promises were made in order to induce him to sign the
forms.  Id. at 47.  Around 12:50 p.m. on January 19, 2009, defendant consented to the search of

the Sony Model DSC-W100 and the Sony Handycam DCR-SR80 and signed the "Consent to Search (Digital Data Devices)" form.  Id. at 48, Gov. Ex. 5.

Defendant was also presented with the "Consent to Search" form.  Tr. at 49; Gov. Ex. 6. That form was also read to the defendant.  Tr. at 49.  Likewise, around 12:50 p.m. on January 19, 2009, defendant consented to the search of the black combination box and signed the "Consent to Search" form.  Id. at 50; Gov. Ex. 6.

Defendant was next advised of his Miranda rights.  Tr. at 40.  At that point defendant invoked his rights by asking for an attorney.  Id. at 51.  Defendant was not asked any other questions and was taken back to the Justice Center about 1:30 p.m.  Id. at 51, 57.

### III.  LEGAL ANALYSIS

A. Events at the Gamestation Sector 19 Store on January 5, 2009

    1.    Statements made by defendant

On January 5, 2009, Sgt. Guinn and Det. Cavaletti met with the defendant at his Gamestation Sector 19 store, which was open to the public.  When the officers arrived at the store during normal business hours, children were playing video games inside the store.  They asked to speak with the defendant and he agreed to do so.  The officers did not give the defendant Miranda warnings at that time.  Nevertheless, any statements made by the defendant should be admissible because "[t]he protections of Miranda apply to custodial interrogations." United States v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir. 2007).  They do not apply to non-custodial interrogations.  Here, the defendant was not in custody and was not required to be informed of his Miranda rights because the encounter the police had with the defendant was consensual.

A consensual encounter does not implicate the Fourth Amendment. United States v. Hathcock, 103 F.3d 715, 718 (8th Cir.1997). "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." United States v. Vera, 457 F.3d 831, 834 (8th Cir.2006), quoting United States v. Drayton, 536 U.S. 194, 200, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). "Mere police questioning does not constitute a seizure." United States v. Barry, 394 F.3d 1070, 1074 (8th Cir. 2005), quoting Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); Hathcock, 103 F.3d at 719; United States v. Slater, 411 F.3d 1003, 1005 (8th Cir. 2005). A consensual encounter becomes a seizure implicating the Fourth Amendment when, considering the totality of the circumstances, the questioning is "so intimidating, threatening, or coercive that a reasonable person would not have believed himself free to leave." Hathcock, 103 F.3d at 718, quoting United States v. McKines, 933 F.2d 1412, 1419 (8th Cir. 1991) (en banc); see also United States v. Johnson, 326 F.3d 1018, 1021 (8th Cir. 2003); INS v. Delgado, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

Id. at 1145.  The officers met the defendant in his store and he was free to leave. There was no show of force.  The officers drove unmarked police cars and did not wear their uniforms and their guns were not drawn.  The defendant was not handcuffed nor confined.  No threats or promises were made to the defendant by the police.  There was nothing so intimidating, threatening, or coercive that a reasonable person would not have believed himself free to leave. Therefore, the encounter the police had with the defendant was consensual and any statements made by the defendant at the Gamestation Sector 19 store on January 5, 2009, should not be suppressed.

2.    Seizure of the HP Computer

The consent to search and seize defendant's HP computer was also valid.  Without any threat or coercion, the defendant voluntarily agreed to the search of his HP computer.

"The Fourth Amendment protects individuals against unreasonable searches and seizures by the government." United States v. Luken, 560 F.3d 741, 744 (8th Cir.2009) (quoting United States v. Williams, 521 F.3d 902, 905 (8th Cir.2008)). The Fourth Amendment generally requires the government to obtain a warrant before searching an area where an individual has a reasonable expectation of privacy. See United States v. Parker, 587 F.3d

8

871, 878 (8th Cir.2009). A search conducted pursuant to voluntary consent is recognized as an exception to the Fourth Amendment's search warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

United States v. Shafer, 608 F.3d 1056, 1064 (8th Cir. 2010).  Thus, the police did not need to

obtain a search warrant because the defendant voluntarily consented to the search.

The court in United States v. Arciniega, 569 F.3d 394, 398 (8th Cir. 2009), set forth

factors to be considered as to whether consent was voluntary:

> Factors relevant to the analysis include (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of his Miranda rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

Id. (citations omitted); see also United States v. Golinveaux, 2010 WL 2925711(8th Cir.).

In applying the factors to the case at hand, defendant's consent was voluntary because (1)

the defendant appeared to understand what he was doing when he gave consent, (2) he did not

appear to be under the influence of anything that would impair his mental abilities, (3) although

he was not informed of his Miranda rights at that time (4) he was aware, through prior

experience of being charged with and going to trial for molesting a child and being acquitted, of

the protections the legal system provides.

Concerning the environment in which defendant gave his consent, (1) defendant was not

detained, (2) the police did not threaten or try to intimidate the defendant, (3) they did not

promise him anything, (5) the consent was given in defendant's store, a public place, and (6)

defendant did not object to the officers taking the computer.  Furthermore, defendant indicated in the consent to search form that his consent was voluntary.  Finally, after the completion of the search of the computer, the officers abided by defendant's request and returned the computer to defendant's employee.

Finally, the officers were not required to give <u>Miranda</u> warnings before requesting consent to search.  In <u>United States v. Saenz</u>, 474 F3d 1132, 1137 (8th Cir. 2007), the Court wrote, "We have not required an officer to provide <u>Miranda</u> warnings before requesting consent to search or held that an absence of <u>Miranda</u> warnings would make an otherwise voluntary consent involuntary."  <u>Id</u>. <u>citing</u> <u>United States v. Payne</u>, 119 F.3d 637, 643 (8th Cir. 1997).  The Court in <u>Payne</u> stated further that "it would be unreasonable to require <u>Miranda</u> warnings before a request for permission to search.  Instead, the fact that <u>Miranda</u> warnings were not given will simply be a factor to consider under the voluntariness test."  <u>Payne</u>, 119 F.3d at 644.

Thus, defendant's consent was voluntary and the seizure and search of the computer should not be suppressed.

B.  <u>Events at Police Headquarters on January 5, 2009</u>

The police asked the defendant to accompany them to Police Headquarters in Clayton, Missouri.  Defendant was not under arrest nor placed in handcuffs.  He went with the police voluntarily.  When they arrived at Police Headquarters,  defendant was asked to sign another consent form.

1.  <u>Consent to Search</u>

Defendant was asked to sign a form entitled, "Consent to Search (Digital Data Devices)." Gov. Ex. 4.  This was an additional form which also gave the officers consent to search the HP

10

computer.  The consent form was read to the defendant and he appeared to listen as it was being read.  Applying the factors set forth in <u>Arciniega</u> to the instant matter, the Court should find defendant's consent voluntary because (1) the defendant appeared to understand what he was doing when he gave consent, (2) he did not appear to be under the influence of anything that would impair his mental abilities, (3) although he was not informed of his <u>Miranda</u> rights at that time (4) he was aware, through prior experience of being charged with and going to trial for molesting a child and being acquitted, of the protections the legal system provides.  He was also familiar with the procedure because just shortly before he provided written consent on a different form.

Concerning the environment in which defendant gave his consent, (1 and 4) defendant was not detained, (2) the police did not threaten or try to intimidate the defendant, (3) they did not promise him anything, (5) the consent was given in defendant's store, a public place, and (6) defendant did not object to the officers taking the computer.  Furthermore, defendant indicated in the consent to search form that his consent was voluntary.  After the completion of the search of the computer, the officers abided by defendant's request and returned the computer to defendant's employee.

As stated above, the officers were not required to give <u>Miranda</u> warnings prior to requesting permission to search.  <u>See</u> <u>Saenz</u>, 474 F3d at 1137;  <u>Payne</u>, 119 F.3d at 643-44.

Thus, defendant again voluntarily consented to the search of the HP computer and the search and seizure of the computer should not be suppressed.  <u>See</u> <u>id</u>.

### 2.   <u>Statements made by the defendant</u>

After defendant consented to the search he was interviewed at Police Headquarters.  The

police were not required to inform defendant of his <u>Miranda</u> rights because he was not subjected to a custodial interrogation.  <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966) ("the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.").  Nevertheless, the police did inform defendant of his <u>Miranda</u> rights.  Defendant was read his <u>Miranda</u> rights and waived those rights in writing and orally.  He acknowledged that he understood the Miranda rights and that he was willing to speak with the detectives.   The officers did not threaten or promise anything to the defendant.  The officers did not intimidate the defendant in any manner.  Likewise, during the course of the interview defendant never requested an attorney nor indicated that he wished to remain silent.   Thus, defendant knowingly and voluntarily waived his rights and his statements should be admissible.

  C.  <u>Events at Ms. Moss residence on January 16, 2009</u>

  On January 16, 2009, Sgt. Guinn met with Ms. Moss and she consented to the police seizing the items brought to her residence by Mr. Douglas.  Defendant claims that this seizure was unconstitutional.  Here, Ms. Moss had apparent or actual authority to consent to the officers seizing the items.  When the Sgt. Guinn met with Ms. Moss, he knew that Mr. Douglas had transported defendant's property to her house from the Gamestation Sector 19 store.  Sgt. Guinn believed that Ms. Moss could grant permission enabling him to seize the evidence.  Ms. Moss signed the consent form giving Sgt. Guinn permission to seize the evidence.

  Defendant cites to <u>United States v. Mar James</u>, 353 F.3d 606 (8th Cir. 2003), to support his claim that the evidence should be suppressed.  In <u>Mar James</u>, a bailee gave the officers

permission to search and seize James' property when the officers knew that the bailee did not have authority to grant that permission.  Id.  In the case at hand, the officers seized defendant's property from his mother's house with her consent and she had actual or apparent authority to grant consent.  Also, there was no evidence that defendant's mother acted as a bailee for the defendant.  Furthermore, the police did not search the seized property until defendant granted the officers permission to search it.

In United States v. Jarrett James, 571 F.3d 707 (7th Cir. 2009), defendant stored a gun used in a robbery in a safe located in his mother's residence.  Jarrett James' mother gave officers permission to seize the safe.  Once the safe was seized, officers obtained a search warrant to open the safe.  The court found defendant's mother had authority to consent to the seizure of the safe.  It said that "[c]onsent to search or seizure may be obtained from any person who has common authority over the property (actual authority), or who would appear to a reasonable person, given the information that law enforcement possessed, to have common authority over the property (apparent authority).  Id. at 714.  As to the initial seizure of the safe, the court said that defendant's mother had authority to consent if: "(1) she had joint control or access to the safe itself (regardless of whether she had access to the contents of the safe) (actual authority); or (2) it was reasonable for police to believe she had joint control of or access to the safe itself (apparent authority)."  Id.  The court found that even though the safe only contained the defendant's belongings, his mother "exercised control over the safe itself.  There [was] no evidence that [defendant] attempted to limit or restrict her control over the safe. . . .  Even if [defendant] had not granted actual authority to [his mother], she had apparent authority because a reasonable person, given the information that [police officers] possessed, would believe that

13

[she] had joint control of the safe." Id.

In the instant offense, defendant's mother had actual authority or apparent authority to consent to the seizure of the property.  She had joint control of or access to the property and it was reasonable for Sgt. Guinn to believe that she had joint control of or access to the property. When Sgt. Guinn asked permission to seize defendant's property from her, she voluntarily gave that permission.  She signed a consent form which read, in part, "I give my consent voluntarily. I have not been threatened, nor have any promises been made to me to obtain my consent." Thus, the property was properly seized by law enforcement officers.

Finally, even if the property was improperly seized, it should not be suppressed under the doctrine of inevitable discovery:

> The inevitable-discovery doctrine posits that if the prosecution can establish by a preponderance of the evidence that the information, otherwise to be suppressed under the exclusionary rule, ultimately or inevitably would have been discovered by lawful means, then the exclusionary rule does not apply. Nix v. Williams, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). In making a demonstration of inevitable discovery, our case law requires the prosecution to show that: (1) there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation. United States v. Conner, 127 F.3d 663, 667 (8th Cir.1997).

Mar James, 353 F.3d at 616-17.

Applying the Mar James reasoning to the instant case, at the time Sgt. Guinn was seeking consent from Ms. Moss, he knew of the existence of the evidence and knew that it may contain contraband.  He knew that Mr. Douglas had taken the evidence to Ms. Moss' residence.  He also knew, through their investigation of defendant for molesting children, that some of the children said they saw images of child pornography on defendant's computer.  Based on this information, Sgt. Guinn had also planned to remain at Ms. Moss' house and while detectives applied for a

14

search warrant.  Therefore, their was a reasonable probability  that the evidence would have been discovered by lawful means and that the police were actively pursuing a substantial, alternative line of investigation.

In conclusion, the evidence was properly seized with consent from Ms. Moss and could have been searched and seized under the doctrine of inevitable discovery.

D.  Events at Police Headquarters on January 19, 2009

1.  Consent to Search

On January 19, 2009, around 12:30 p.m., Detectives Cavaletti and Brillos went to St. Louis County Justice Center to take custody of the defendant and bring him to Police Headquarters.  They were conducting an investigation regarding new offenses.  They showed the defendant the evidence that was seized from Ms. Moss' residence and asked for his consent to search the items.  He was presented with two different consent to search forms: one for the black combination box and another for the cameras. Defendant had been informed of his Miranda rights on January 5, 2009, approximately two weeks earlier.  Nevertheless, the officers were not required to advise defendant of his Miranda rights before seeking consent to search.  See, supra, Saenz, 474 F3d at 1137;  Payne, 119 F.3d at 643-44.  "Instead, the fact that Miranda warnings were not given will simply be a factor to consider under the voluntariness test."  Payne, 119 F.3d at 644.

The consent forms were read to the defendant and he appeared to listen as it was being read.  Applying the factors set forth in  Arciniega to the instant matter, the Court should find defendant's consent voluntary because (1) the defendant appeared to understand what he was doing when he gave consent, (2) there was no testimony that he appeared to be under the

15

influence of anything that would impair his mental abilities, (3) he was familiar with his <u>Miranda</u> rights because he was informed of the approximately two weeks earlier, and defendant did not request an attorney, (4) he was aware, through the prior experience of being charged, tried and acquitted of molesting a child, of the protections the legal system provides.  He was also aware of the procedure used because two weeks earlier had signed two other consent to search forms.

Concerning the environment in which defendant gave his consent, (1 and 4) although defendant had been in custody for approximately two weeks, (2) the police did not threaten or try to intimidate the defendant, (3) they did not promise him anything, (5) the consent was given in the Police Headquarters; and (6) defendant did not object to the officers asking for consent nor was there any evidence that he ever tried to revoke his consent.  Furthermore, defendant indicated in the consent to search forms that his consent was voluntary.

Even though defendant was in custody, "[t]he custodial status of the consenting party is not determinative."  <u>United States v. Fleck</u>, 413 F.3d 883, 892 (8th Cir. 2005) (internal quotations and cite omitted).  Considering all the factors, defendant's consent was voluntary.

Alternatively, the evidence should not be suppressed according to the doctrine of inevitable discovery as set forth in <u>Mar James</u>.  Sgt. Guinn knew of the existence of the evidence and knew that it may contain contraband.  He also knew, through the police investigation, that the defendant was accused of molesting children, and that some of the children said they saw images of child pornography on defendant's computer.  Based on this information, Sgt. Guinn had previously planned to have detectives apply for a search warrant.  Therefore, their was a reasonable probability  that the evidence would have been discovered by lawful means and that the police were actively pursuing a substantial, alternative line of investigation.

16

Thus, the search of the cameras and the contents of the black combination box should not be suppressed.

　　　　2.　　Inquiries made by defendant

When police showed the property to the defendant, defendant said he did not know whether the black combination box was his.  At this point there was a discussion about the box, including asking for the combination to the lock on the box, to which defendant responded that he did not remember.[1]  This was not a custodial interrogation for which <u>Miranda</u> warnings were required.

> Interrogation occurs when a law enforcement officer engages in "either express questioning or its functional equivalent," which includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  "Voluntary statements not in response to an interrogation," however, "are admissible with or without <u>Miranda</u> warnings."

<u>United States v. Hernandez-Mendoza</u>, 600 F.3d 971, 976-77 (8th Cir. 2010) (citations omitted).

In the instant case, defendant initiated the conversation with the officers by asking whether the black combination box was his.  This was a voluntary statement.  "Volunteered statements of any kind are not barred by the Fifth Amendment. . . ."  <u>Rhode Island v. Innis</u>, 446 U.S. 291, 299 (1980).  The discussion that followed was not an interrogation because it was a response to defendant's inquiries.  <u>Cf.</u> <u>United States v. Lockett</u>, 393 F.32d 834, 839 (8th Cir. 2005) (When officers told the defendant they were looking for him and explained to him why he was being arrested, they "had no reason to believe that [those] statements would elicit

---

[1]In addition to the testimony at the evidentiary hearing, the police report also contains the content of the discussions concerning the black combination box, which includes, but is not limited to, the discussion concerning the combination to the box.

incriminating responses from [defendant]. The statements were instead responses to [defendant]'s own inquiries and thus part of a conversation 'normally attendant to arrest and custody.'"). In order for the discussion to be an interrogation, it "must reflect a measure of compulsion beyond that inherent in custody itself." Innis, 446 U.S. at 300. Here, there is absolutely no evidence of any compulsion beyond that inherent in custody itself. Thus, the statements should not be suppressed.

In Fleck, police officers "responded to a disturbance involving personal property at a house owned by Robert and Ken Fleck, and their sister. . . ." Fleck, 413 F.3d at 888. Either Robert or Ken Fleck answered the door when to officers arrived. The officers said that they had received a report that stolen property was located inside the residence. The officers were then invited inside the residence. The officers observed some stolen property and left the residence waiting for detectives to arrive. Id. One of the detectives checked the Flecks' criminal records and discovered they were both convicted felons. Id. When the detectives arrived at the residence one of the detectives went inside the Flecks' residence and asked for permission to search the house. Ken Fleck signed a consent form. Five people, besides the officers, were in the house. Some of the officers stayed with the five while others searched the residence. Id. While searching the residence, the officers found a bedroom that was padlocked. They asked the five people "whose bedroom it was. Robert said that the bedroom was both his and Ken's. Ken agreed. Robert then said that he had the key and gave it to [a detective]." Id. at 888-89. When the officers searched the bedroom they found guns, among other things. An officer then asked the Flecks who owned the guns. "The two responded that the guns belonged to both of them." Id. at 889. "At no time were the Flecks given their Miranda warnings." Id. They were both

18

arrested. While they were being booked, Robert asked why he and Ken were being arrested for possessing guns that they had inherited. Id.

The Flecks moved to suppress all their statements. The district court denied the defendant's motion with respect to the officers asking for a key to the bedroom, but granted it with respect to all statements made at the residence after the guns were found. On appeal, the Flecks claimed that asking for a key to the bedroom was an interrogation. The court of appeals found that the asking for a key to the bedroom was not an interrogation. Id. at 892. The court wrote:

> Though the offices asked a direct question regarding the key to the bedroom, it was not the kind of investigative questioning–intended to elicit an incriminating response–that was at issue in Miranda. See Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Nothing further regarding authority over the bedroom-and hence ownership of or authority over the guns found in it–was admitted by Robert in producing the key since the brothers already told the officers they were co-owners of the entire house."

Id. at n.2.

Similarly, the officers in the instant matter did not conduct an interrogation by responding to defendant's questions about the black combination box. The purpose of the conversation was to answer defendant's questions, not to get involved in investigative questioning intending to elicit incriminating responses. Just as in Fleck, the officers already knew that the property belonged to defendant because defendant's mother told them so. In Fleck, after the guns were discovered in the locked room, the officers asked who owned the guns. In the instant case, once the black combination box was opened, the officers did not go back to the defendant and ask whether the contents of the box belonged to him. Thus, the statements made by defendant should not be suppressed.

19

Even if the Court determines that the questioning violated <u>Miranda</u>, it was nevertheless voluntary and would not invalidate the consent to search.  <u>Fleck</u>, 413 F.3d at 893 ("In this circuit, we have refused to extend the fruit-of-the-poisonous-tree doctrine to exclude physical evidence derived from a voluntary statement made in the wake of a <u>Miranda</u> violation.").

## IV.  CONCLUSION

For all of the foregoing reasons, the defendant's motion to suppress evidence and statements should be denied.

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney


 *s/ Robert F. Livergood*
ROBERT F. LIVERGOOD, 22937
Assistant United States Attorney
111 S. 10th Street, Rm. 20.333
St. Louis, Missouri 63102
(314) 539-2200

**CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2010, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Ms. Nanci McCarthy
Assistant Federal Public Defender
Office of the Federal Public Defender
1010 Market Street, Suite 200
St. Louis, MO 63101                      *s/ Robert F. Livergood*
                                         ROBERT F. LIVERGOOD, 22937
                                         Assistant United States Attorney